United States Courts
Southern District of Texas
FILED
November 04, 2026
Nathan Ochsner, Clerk of Court

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **VITOL INTERNATIONALSHIPPING PTE LTD, Plaintiff,** | § | **CIVIL ACTION NUMBER 4:26-cv-02122** |
| | § | **IN ADMIRALTY, Rule 9(h)** |
| **Versus** | § | |
| | § | **JUDGE ANGELA V. COLMENERO** |
| **MVP TERMINALLING,LLC, Defendant.** | § | |

**CONSOLIDATED WITH**

| | | |
|---|---|---|
| **VALERO MARKETING & SUPPLY COMPANY, Plaintiff,** | § | **CIVIL ACTION NUMBER 26-CV-02150** |
| | § | **IN ADMIRALTY, Rule 9(h)** |
| **Versus** | § | |
| | § | **JUDGE ANGELA V. COLMENERO** |
| **MVP TERMINALLING, LLC, VITOL INTERNATIONAL SHIPPING PTE. LTD., & BANGLADESH SHIPPING CORP.; in personam, and the BANGLAR AGRAJATRA, her engines, tackle, apparel, etc., in rem Defendants.** | § | |

**VALERO MARKETING & SUPPLY COMPANY'S
<u>FIRST AMENDED COMPLAINT</u>**

Plaintiff, Valero Marketing & Supply Company ("Valero"), through its attorneys, Hall Maines Lugrin, PC, files this First Amended Complaint in C.A. No. 26-CV-02150 against MVP Terminalling, LLC ("MVP"), Vitol Shipping International Pte. Ltd. ("Vitol"), Bangladesh Shipping Corporation, ("BSC"), *in personam* and the BANGLAR AGRAJATRA, her engines, tackle, apparel, etc. ("Vessel"), *in rem*, (BSC and Vessel collectively are "Vessel Interests"). Plaintiff alleges and pleads as follows:

## I.
## JURISDICTION AND VENUE

1. This is an admiralty or maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure. Accordingly, the Court has original jurisdiction of these admiralty and maritime claims under 28 U.S.C. § 1333.

2. Subject matter jurisdiction exists over Valero's claims against BSC under the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605(a)(2), which provides that a foreign state "shall not be immune from the jurisdiction of courts of the United States or of the States in any case— … in which the action is based upon a commercial activity carried on in the United States by the foreign state." As a corporate entity of the Bangladesh Government, BSC engaged in commercial activity in the United States and the action is based on the nature of that activity, that is, taking on liquid cargoes aboard the vessel BANGLAR AGRAJATRA at a berth in Texas. There is a clear connection between Valero's claims of cargo contamination against BSC occurring aboard its vessel and its acts in the United States, i.e., taking on Valero's cargo at a Texas port, which is where the cargo contamination occurred.

3. Venue is proper in this Court under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions given rise to the claim occurred in this judicial district.

## II.
## PARTIES

4. Plaintiff Valero is a Delaware corporation with its principal place of business in San Antonio, Texas.

5. Defendant MVP, a Texas company with its principal place of business in Pasadena, Texas. MVP held onto the cargo that is the subject matter in this case and participated in transferring it to the Vessel. MVP has appeared and may be served through its counsel of record.

6. Defendant Vitol is a foreign corporation or other business entity with an address located at 128 Beach Road, #28-01, Guoco Midtown Office, Singapore 189773. Vitol has appeared and may be served through its counsel of record.

7. Defendant BSC is a foreign corporation or other business entity with an address located at BSC Bhaban, Saltgola Road, P.O. Box Np. 641, Chattogram-4100, Bangladesh. BSC has appeared and may be served through its counsel of record.

8. Defendant Vessel, IMO No. 9793856, was and is a Bangladesh-flagged chemical/oil products tanker which the subject cargo was loaded into. During the pendency of this action, the Vessel will be within the jurisdiction of this Court.

## III.
## BACKGROUND

9. Valero is engaged in the business of selling and distributing oil products and other related commodities.

10. Valero and Vitol executed a Voyage Charter Agreement ("Charter")[1] for shipping of Valero's energy products – jet oil, biodiesel, ethanol, and gasoline – on the Vessel, the BANGLAR AGRAJATRA. Vitol undertook responsibility to ship Valero's product by agreeing to load product at 1 to 2 ports in the U.S. Gulf and discharge at 1 to 3 ports in Peru and that the "[c]harter's voyage instructions are deemed to form an integral part of the [Charter]". When loading and unloading product, Vitol agreed that "when Vessel loads and/or discharges at sea terminal(s), Vessel shall be properly equipped… for operations at such terminal(s)." Vitol further agreed that the product would be "pumped into Vessel at the expense and risk of [Vitol]" up to a designated transfer point.

---

[1] Exhibit 1 (Charter Agreement)

11. Valero's nomination and voyage orders required Vessel to load its product at MVP, the owner and operator of a marine terminal located along the Houston Ship Channel in Pasadena, Texas. Afterwards the Vessel was intended to disport for Callao, Peru, where Valero would sell its product to its own subsidiary ("VLO Peru").

12. Valero and MVP entered into the Terminalling Agreement ("Terminal Agreement")[2] whereby MVP agreed to provide for the unloading, loading, and storage of Valero's product. MVP agreed to store and handle Valero's product into and out of the storage tanks and to provide such facilities to perform proper handling and care in a good workmanlike manner in accordance with Good Industry Practice. Upon receipt of Valero's product at an MVP flange, MVP assumes "custody, control, and responsibility" for that product.

13. The Terminal Rules and Regulations ("Rules and Regulations")[3] between MVP and the Vessel establish obligations that concern Valero's product. Coordination duties require that there be a pre-transfer conference and "[the Vessel] and MVP must plan the sequence to be used for the transfer of cargo, the pumps, and pipelines to be used, and the rate of transfer". MVP and Vessel obligations affect Valero's rights and interests in product quality.

14. Upon information and belief, there is an agreement between Vitol and the Vessel and/or Vessel Interests concerning the events giving rise to this lawsuit.

15. On March 17, 2024, the Vessel's notice of readiness was accepted by MVP, and it berthed at the MVP dock #2, and the nominated product parcels to be loaded from MVP to the Vessel consisted of gasoline 95.2, gasoline 90.2, and ULSD-B5 ("Cargo").

16. Valero's tendered Cargo to MVP tested on-specification ("on-spec") before MVP commenced loading the Cargo onto the Vessel.

[2] Exhibit 2 (Terminalling Agreement)
[3] Exhibit 3 (Terminal Rules and Regulations)

17. MVP delivered the Cargo to the Vessel by way of transfers from its shore tanks. MVP, the Vessel Interests, and Vitol were responsible for loading Cargo according to obligations established in agreements between the parties, the Terminal Rules and Regulations, and other applicable agreements.

18. During the process of transfer, MVP, the Vessel Interests, and/or Vitol allowed contamination of the Cargo, and the contamination was caused in whole or in part by the acts, omissions, fault, negligence, want of due care, failure to warn, improper valve operation, line and/or tank cleaning, improper handling, improper operations and coordination, and/or breach of warranty and/or breach of bailment.

19. Routine initial sample testing was performed by Amspec, Valero's designated cargo quality inspector, who sampled the Cargo at the start of loading and throughout the transfer of Cargo from MVP to the Vessel. Amspec's initial sampling indicated Cargo variances from what MVP delivered and what Valero received. Initial sampling further revealed that the gasoline was off-specification ("off-spec") for octane and contained FAME, and ULSD-B5 was off-spec for flash point to varying degrees.

20. On or about, March 19, 2024, loading of the Cargo was completed and the Vessel de-berthed from MVP and was diverted to the Galveston Fairway Anchorage. Pursuant to the Terminal Agreement, Valero performed additional testing for contamination. Amspec resampled to confirm initial off-spec findings and on March 22, 2024, further sample testing by third parties were conducted by Camin Cargo and Intertek. Laboratory testing concluded that Valero's Cargo was contaminated.

## IV.
## FIRST CAUSE OF ACTION – BREACH OF CONTRACT AGAINST MVP

21. Plaintiff repeats and reasserts each and every allegation.

22. Valero and MVP entered into a valid enforceable Terminal Agreement for unloading, loading, storage, of Valero's Cargo. MVP agreed to provide to store and handle Valero's product into and out of the storage tanks and to provide such facilities to perform proper handling and care in a good workmanlike manner in accordance with Good Industry Practice. Upon receipt of Valero's product at an appropriate MVP flange, MVP assumes "custody, control, and responsibility" for that product. Valero performed all of the obligations required under the Terminal Agreement.

23. The Terminal Agreement requires MVP to use reasonable care and diligence to preserve and protect Valero's Cargo from damage or loss while in MVP's custody. MVP breached its obligation to use reasonable care and diligence, perform proper handling and care in a good workmanlike manner, and Good Industry Practice by allowing negligent handling and contamination of the Cargo.

24. MVP's breaches of contract proximately caused significant and foreseeable damages and loss to Valero and Valero seeks recovery of all damages, costs, expenses, interest, and attorneys' fees that have been or may be incurred as a foreseeable result of MVP's contractual breaches.

## V.
## SECOND CAUSE OF ACTION – NEGLIGENCE AGAINST MVP

25. Plaintiff repeats and reasserts each and every allegation.

26. MVP's handling, transferring, and delivery of Cargo from Valero's storage tanks to the Vessel, which allowed pre-loading on-spec Cargo to become off-spec, unsuitable, substandard, defective, and/or contaminated constitutes negligence. MVP owed a duty to Valero to act non-negligently by providing reasonable care in unloading, handling, transferring and loading on-spec

Cargo, and to ensure the unloading, handling, transferring and loading was not defective, and did not contaminate the Cargo.

27. In addition, MVP owed Valero independent duties from the Terminal Agreement. A carve out under the Terminal Agreement allows for liability for damage or loss for "damaged, downgraded, redesigned, lost or destroyed [Cargo] to the extent such was caused by the negligence and/or willful misconduct of MVP." Also, under general maritime law MVP was to use reasonable care in handling, retaining custody, and delivering Valero's Cargo. These duties exist separately and apart from the Terminal Agreement.

28. MVP's failure to do the above described was negligent and the breach of its duty to proximately cause damages to Valero.

29. Valero seeks recovery of all damages, costs, and expenses that have been or may be incurred as a result of MVP's negligent conduct.

## VI.
## THIRD CAUSE OF ACTION – BREACH OF EXPRESS WARRANTY AND IMPLIED WARRANTY OF WORKMANLIKE PERFORMANCE AGAINST MVP

30. Plaintiff repeats and reasserts each and every allegation.

31. Valero purchased services and the use of facilities from MVP in exchange for certain express warranties with respect to the handling of the Cargo while in MVP's care, custody and/or control. MVP's representations were part of the benefit of the bargain as set forth in the Terminal Agreement. When the Cargo was off-spec after unloading, handling, transferring, and loading by MVP, it did not comply with the representations and warranties agreed to by MVP. Further, the services received from MVP failed to conform to the character or quality of the services as expressly promised.

32. Valero further purchased services from MVP with the expectation that MVP would perform proper handling and care in a good workmanlike manner in accordance with Good Industry Practice. The term Good Industry Practice defined by the Terminal Agreement requires MVP to use "standards, practices, methods, and procedures and exercise reasonable judgment, skill, care, diligence, prudence, and foresight that would be expected to be observed by a skilled and experienced operator." The Terminal Agreement provided that "control and operation of the [MVP] terminal will rest exclusively with MVP", placing responsibility for safe and proper handling of Valero's Cargo on MVP. Under maritime law, MVP owed Valero an implied warranty of workmanlike performance as an experienced terminal operator and MVP breached its warranty by failing to use to use reasonable care and diligence in handling Valero's Cargo, resulting in contamination while the Cargo was in MVP's exclusive control.

33. Valero has suffered damages and loss as a result of the breach of warranties.

## VII.
## FOURTH CAUSE OF ACTION –
## BREACH OF BAILMENT AGAINST MVP

34. Plaintiff repeats and reasserts each and every allegation.

35. Valero delivered its Cargo to MVP in trust for the specific purpose to keep safe, transfer, and properly load its Cargo onto the Vessel. MVP accepted the delivery of the Cargo on behalf of Valero. Valero and MVP contracted in the Terminal Agreement setting out duties to be carried out. The Terminal Agreement contained terms that Valero expected its Cargo would be transferred or delt with as directed. MVP breached its duties as a bailee with respect to the Cargo which Valero entrusted to MVP's care, custody, and control, by failing to deliver the Cargo to the Vessel in good condition

36. Valero has suffered damages and loss as a result of MVP breaching its bailment obligations.

## VIII.
## FIFTH CAUSE OF ACTION – CONTRACTUAL INDEMNITY AGAINST MVP

37. Plaintiff repeats and reasserts each and every allegation.

38. Valero provided on-spec Cargo at the shore tank that were stored at the MVP terminal. Valero did not contaminate the Cargo in any way, did not cause or have knowledge of any adulteration or contamination, and Valero at all times stored and handled the Cargo in the manner necessary to maintain on-spec condition for sale prior to relinquishing custody and/or control to MVP. Liability for the contamination of Valero's Cargo occurred while in custody and/or control of MVP.

39. Valero has suffered damages and loss as a result of MVP's breach of the Terminal Agreement and negligent unloading, handling, transferring and loading of the Cargo which was contaminated. MVP breached the Terminal Agreement and was negligent when the Cargo was contaminated. Accordingly, MVP is required to indemnify Valero for all losses, damages, costs, property damage, attorney's fees, expert fees, court costs, other costs of litigation, and liabilities arising from the contamination event.

## IX.
## SIXTH CAUSE OF ACTION – NEGLIGENCE AGAINST THE VESSEL INTERESTS

40. Plaintiff repeats and reasserts each and every allegation.

41. The Vessel Interests' handling, transferring, and delivery of Cargo when loading onto the Vessel, which allowed for pre-loading on-spec Cargo to become off-spec, unsuitable, substandard, defective, and/or contaminated constitutes negligence. The Vessel Interests owed a

legal duty to Valero to deliver the Cargo in the same and good order and condition as when received.

42. The Cargo in good condition was delivered in trust to BSC's Vessel, BANGLAR AGRAJATRA, which knowingly accepted delivery and control of the Cargo. When Valero's Cargo was aboard the Vessel, the Vessel had exclusive right to possession and control of the Cargo, even as against Valero. No employee or agent of Valero had access to or control over the Cargo while it was aboard the Vessel.

43. In its Time Charter with Vitol, the Vessel Interests were responsible at all times for proper stowage and care of the Cargo, which must be controlled by the Vessel Interests' master. A bailment of the Cargo arose in favor of the Cargo's Owner Valero because BSC and the Vessel undertook that a trust would be carried out, that is, the Cargo would be safely loaded, transported and discharged at the destination port per the instructions received.

44. The Vessel Interests breached their duty to Valero by failing to deliver the Cargo in the same good order and condition as when received. The Vessel Interests' careless, negligent, and reckless conduct caused the contamination and the resulting off-spec Cargo.

45. The Vessel Interests' failure to do the above described was negligent and the breach of its duty proximately caused damages to Valero.

46. Valero seeks recovery of all damages, costs, and expenses that have been or may be incurred as a result of the Vessel Interests' negligent conduct.

47. The Vessel Interests negligent acts and omissions constitute a maritime tort which gives rise to a maritime lien against the Vessel which Valero are entitled to enforce pursuant to Rule C of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions of the Federal Rules of Civil Procedure against the Vessel, in rem.

## X.
## SEVENTH CAUSE OF ACTION –
## UNSEAWORTHINESS AGAINST THE VESSEL INTERESTS

48. Plaintiff repeats and reasserts each and every allegation.

49. The Vessel Interests caused and permitted the Vessel to be unseaworthy by failing to clean prepare, inspect, and maintain the Vessel's tanks, lines, equipment, or cargo handling procedures prior to receiving Valero's Cargo, and failing to have a crew to handle the Cargo without causing its contamination. The Vessel Interests further failed to implement and follow cargo handling procedures in receiving Valero's Cargo, failed to ensure that all tanks and lines were free from prior residues or contaminants, and failed to exercise care and diligence required of a competent carrier under maritime law in segregating Valero's Cargo so it did not become off-spec. The Vessel was not reasonably fit for its intended purpose and was incapable of receiving, carrying, or preserving Valero's Cargo without causing contamination. This unseaworthy condition directly and proximately caused damage to Valero's Cargo.

50. As a direct and proximate cause of the Vessel Interests' breach of their duties and obligations, Valero suffered damages, including but not limited to, the costs of replacement cargo, increased ocean freight charges, costs of the mitigation of the damaged cargo, increased demurrage, increased bunker consumption and increased inspection and analysis costs.

## XI.
## EIGHTH CAUSE OF ACTION –
## BREACH OF IMPLIED WARRANTY OF SEAWORTHINESS
## AGAINST THE VESSEL INTERESTS

51. Plaintiff repeats and reasserts each and every allegation.

52. The Vessel Interests warranted, expressly and impliedly under maritime law, that the Vessel would be seaworthy and fit in all respects to receive, carry, and preserve the Cargo at the commencement of loading. The Vessel Interests breached this implied warranty because the

Vessel's tanks, lines, or systems were contaminated, inadequately prepared, or otherwise unfit resulting in damage to the Cargo.

53. As a direct and proximate cause of the Vessel Interests' breach of their duties and obligations, Valero suffered injury which resulted in Valero suffering damages, including but not limited to, the costs of replacement cargo, increased ocean freight charges, costs of the mitigation of the damaged cargo, increased demurrage, increased bunker consumption and increased inspection and analysis costs.

## XII.
## NINTH CAUSE OF ACTION –
## BREACH OF BAILMENT AGAINST THE VESSEL INTERESTS

54. Plaintiff repeats and reasserts each and every allegation.

55. Vessel Interests were acting as bailees of the shipment at the time it was contaminated. The Vessel Interests were, or through their contractors, agents, servants, or sub-bailees, bailees who warranted and had a legal duty to safely keep, care for, maintain, and deliver the Cargo in the same good order and condition and Valero entrusted them to perform their services as bailees, or to ensure that those services were performed with reasonable care and in a non-negligent and workmanlike manner.

56. When Valero's Cargo was aboard the Vessel, the Vessel had exclusive right to possession and control of the Cargo, even as against Valero. No employee or agent of Valero had access to or control over the Cargo while it was aboard the Vessel.

57. In its Time Charter with Vitol, the Vessel Interests were responsible at all times for proper stowage of Cargo, which must be controlled by the Vessel Interests' master.

58. The Vessel Interests breached, failed and violated their duties and obligations as bailees of the Cargo, were otherwise at fault and negligently failed to deliver the shipment as

designated in the same good condition as when entrusted to them but rather in a contaminated condition and off-spec.

59. Valero has suffered damages and loss as a result of the Vessel Interests breaching its bailment obligations.

## XIII.
## TENTH CAUSE OF ACTION –
## BREACH OF CONTRACT AGAINST VITOL

60. Plaintiff repeats and reasserts each and every allegation.

61. Valero and Vitol entered into a valid enforceable Charter for the shipment of Valero's Cargo. Vitol agreed to load Valero's Vargo at one to two ports in the U.S. Gulf and discharge at one to three ports in Peru and expressly agreed any voyage instructions would be part of the Charter agreement. Vitol further agreed that when the Vessel loads or discharges at sea terminals, the Vessel would be properly equipped for operations at such terminals. Vitol also accepted responsibility for the product being "pumped into Vessel at the expense and risk of [Vitol]" up to the designated transfer point. Valero performed all obligations required of it under the Charter Party and voyage orders.

62. Pursuant to Valero's Charter with Vitol, Vitol was fully and solely responsible for the operation, management and navigation of Vessel during the entire cargo loading operation.

63. The Charter and voyage orders required the Vessel to load Valero's product at MVP's marine terminal in Pasadena, Texas, on-spec and thereafter proceed to Callao, Peru, where Valero intended to deliver the product to its subsidiary, VLO Peru. Vitol breached its contractual obligations by failing to ensure that the Vessel and MVP's terminal facilities were properly equipped, prepared, and fit to load, receive, and handle Valero's Cargo without causing contamination. Vitol failed to ensure that the Vessel's cargo systems, tanks, lines, and equipment were suitable and free from prior residues or contaminants, and likewise failed to ensure that

MVP's terminal operations, equipment, and transfer systems were capable of safely handling Valero's product without introducing foreign substances. Vitol's failure to comply with its contractual duties resulted in the improper handling, loading, and carriage of the Cargo and caused contamination and physical damage to Valero's product.

64. Vitol proximately caused significant damages and loss to Valero and Valero seeks recovery of all damages, costs, expenses, interest, and attorneys' fees that have been or may be incurred as a result of Vitol's contractual breaches.

## XIV.
## ELEVENTH CAUSE OF ACTION – NEGLIGENCE AGAINST VITOL

65. Plaintiff repeats and reasserts each and every allegation.

66. Vitol's conduct in arranging, supervising, and undertaking the shipment of Valero's Cargo by directing the Vessel to load at MVP, assuming responsibility for loading operations "at the expense and risk of [Vitol]," and agreeing that the Vessel would be properly equipped for operations at the loading terminal, allowed Valero's on-spec Cargo to become off-spec, unsuitable, substandard, defective, and contaminated. Vitol owed Valero a duty to act non-negligently in coordinating, supervising, and ensuring the safe loading, handling, and transfer of Valero's Cargo, and to ensure that neither the Vessel nor the terminal operations would damage the Cargo.

67. In addition, Vitol owed Valero independent duties separate from the Charter. Under general maritime law, Vitol had a duty to exercise reasonable care in selecting, preparing, and providing a vessel fit to receive and carry Valero's Cargo without contamination and a duty to ensure that cargo handling would not cause contamination or foreseeable harm. These duties arise independently of the Charter and exist because Vitol assumed responsibility for the product "at the expense and risk of [Vitol]" up to the designated transfer point.

68. Vitol's failure to do the above described was negligent and the breach of its duty proximately caused damages to Valero.

69. Valero seeks recovery of all damages, costs, and expenses that have been or may be incurred as a result of Vitol's negligent conduct.

## XV.
## TWELFTH CAUSE OF ACTION –
## BREACH OF EXPRESS WARRANTY AND IMPLIED WARRANTY OF WORKMANLIKE PERFORMANCE AGAINST VITOL

70. Plaintiff repeats and reasserts each and every allegation.

71. Valero purchased services from Vitol in exchange for express warranties regarding the loading, handling, and carriage of Valero's Cargo. Under the Charter, Vitol expressly undertook responsibility to load Valero's product at one to two ports in the U.S. Gulf, to discharge at one to three ports in Peru, and agreed that the Charterer's voyage instructions "form an integral part of the Charter." Vitol further expressly warranted that when the Vessel loads or discharges at sea terminals, the Vessel would be "properly equipped… for operations at such terminal(s)," and that the product would be "pumped into Vessel at the expense and risk of [Vitol]" up to the designated transfer point. These representations were part of the benefit of the bargain. When the Cargo became off-spec after loading and handling under Vitol's direction and responsibility, the Cargo did not comply with the express representations and warranties Vitol made and failed to conform to the character or quality of the services Vitol expressly promised.

72. Valero further purchased services from Vitol with the expectation that Vitol would perform its contractual undertakings in a proper and workmanlike manner. Under maritime law, Vitol owed Valero an implied warranty of workmanlike performance as a party undertaking to ensure the safe loading and carriage of Valero's Cargo. This included the duty to exercise reasonable judgment, skill, care, diligence, and prudence in ensuring that both the Vessel and the

terminal facilities selected for loading were properly equipped, prepared, and fit to not cause contamination. Vitol breached its implied warranty of workmanlike performance by failing to ensure that the Vessel's tanks, lines, and cargo handling procedures were suitable to receive and preserve the Cargo, and by failing to ensure that MVP's terminal operations and equipment could safely handle the Cargo without introducing contaminants. Vitol's failure to exercise reasonable care and diligence in performing these responsibilities resulted in contamination and physical damage to Valero's Cargo.

73. Valero has suffered damages and loss as a result of the breach of warranties.

## XVI.
## FOR THE COURTS EYES ONLY

74. Plaintiff hereby gives notice to the Court and all parties concerned that various Underwriters issued a policy of insurance which insured Plaintiff, and which insured a portion of the loss which forms the basis of this lawsuit. Pursuant to the insurance policy, at the time of filing this lawsuit, Underwriters have made payments on the loss. Pursuant to their subrogation rights under the insurance policy they issued to Plaintiff, Underwriters are real parties in interest and have joined Valero in bringing this lawsuit.

## XVII.
## PRAYER

WHEREFORE, PREMISES CONSIDERED Valero requests that the Court enter an order or judgment in Valero's favor against Defendants, jointly and severally, on each of the causes of action specified for the amount of Plaintiff's damages, together with interest, costs and disbursements of this action and attorney's fees; and that the Court grant such other, further and different relief at law, in admiralty, and/or in equity as the Court deems just and proper.

Respectfully submitted,

HALL MAINES LUGRIN, PC

/s/ *M. Matt Jett*

M. Matt Jett SBN: 24068684
Federal I.D. No.: 1091711
Wesley Keel SBN: 24060074
Federal I.D. No.: 883641
Even Caffrey SBN: 03588650
Federal I.D. No.: 13178
2800 Post Oak Blvd., 64th Floor
Houston, Texas 77056-6125
Tel.: 713.871.9000
Fax: 713.871.8962
mjett@hallmaineslugrin.com
wkeel@hallmaineslugrin.com
ecaffrey@hallmaineslugrin.com

***Attorneys for Plaintiff, Valero Marketing and Supply Company***

## CERTIFICATE OF SERVICE

I certify that on September 15, 2026, I electronically filed the foregoing document(s); that they are available for viewing and downloading from the Court's CM/ECF system; and that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

**ATTORNEYS FOR DEFENDANT VITOL INTERNATIONAL SHIPPING PTE., LTD** *Via e-service.*

James D. Bercaw
Michael Cerniglia
King & Jurgens, L.L.C.
201 St. Charles Ave., Ste. 4500 New Orleans, LA 70170
(504) 582-3800
Jbercaw@kingjurgens.com
mcerniglia@kingjurgens.com.
-and-
Michael S. Wright
King & Jurgens, L.L.C.
6363 Woodway, Suite 820
Houston, Texas 77057
(713) 334-5644
mwright@kingjurgens.com

**ATTORNEY FOR BANGLADESH SHIPPING CORPORATION** *Via e-service*
.

Kevin P. Walters
Blake E. Bachtel
Royston Law
1415 Louisiana, Suite 4200
Houston, Texas 77002
(713) 224-8380
Kevin.walters@roystonlaw.com
Blake.bachtel@roystonlaw.com

**ATTORNEYS FOR DEFENDANT MVP TERMINALLING, LLC** *Via e-service*

Ivan M. Rodriguez
Mark A. Youngjohn
Phelps Dunbar LLP
ivan.rodriguez@phelps.com
mark.youngjohn@phelps.com

1001 Fannin St, Ste 2200
Houston, Texas 77002
(713) 626-1386
ivan.rodriguez@phelps.com
mark.youngjohn@phelps.com

*/s/ M. Matt Jett*
M. Matt Jett